[Cite as *State v. Williams*, 2016-Ohio-3454.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### Nos.   103343 and 103350

---

## STATE OF OHIO

**PLAINTIFF-APPELLEE/
CROSS-APPELLANT**

vs.

## ALAN S. WILLIAMS

**DEFENDANT-APPELLANT/
CROSS-APPELLEE**

---

### JUDGMENT:
### AFFIRMED IN PART, REVERSED IN PART,
### AND REMANDED

---

Criminal Appeals from the
Cuyahoga County Court of Common Pleas
Case No. CR-12-561112-A

**BEFORE:**   Boyle, P.J., S. Gallagher, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:**   June 16, 2016

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1360 East 9th Street
Suite 600
Cleveland, Ohio   44114


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Amy Venesile
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, P.J.:

{¶1}   Defendant-appellant, Alan S. Williams, appeals his convictions.   He raises one assignment of error for our review:

> The trial court erred in entering a verdict which was against the manifest weight of the evidence, in derogation of defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

{¶2}   Plaintiff-appellee, the state of Ohio, cross-appeals, raising the following assignment of error:

> The trial court erred when it merged the kidnapping counts against the child victims with those of the adult victims in violation of R.C. 2941.25(B) and contrary to the Ohio Supreme Court's holding in *State v. Ruff*, 2015-Ohio-1441.

{¶3}   After review, we find no merit to Williams's assignment of error, but sustain the state's assignment of error.   Thus, we affirm in part, reverse in part, and remand for resentencing.

## I.  Procedural History and Factual Background

{¶4}   In April 2012, Williams was indicted on 14 counts: four counts of aggravated robbery in violation of R.C. 2911.01(A)(1), four counts of robbery in violation of R.C. 2911.02(A)(2), and six counts of kidnapping in violation of R.C. 2905.01(A)(2). Each count carried one- and three-year firearm specifications.   Williams pleaded not guilty to the charges.

**{¶5}** Williams's case proceeded to a jury trial in February 2013. Williams was convicted of all charges and sentenced to 45 years in prison. Williams appealed. This court vacated Williams's convictions and sentence, finding that the trial court erred when it found that Williams was incapable of making a knowing, intelligent, and voluntary waiver of his right to counsel. *See State v. Williams*, 8th Dist. Cuyahoga No. 99859, 2014-Ohio-1057.

**{¶6}** Upon remand, Williams elected to proceed with appointed counsel. After being evaluated at the court psychiatric clinic, the case was subsequently transferred to another judge on the mental health docket. Williams waived his right to a jury trial, and the following facts were presented to the bench.

**{¶7}** Lorrein Gaines testified that on March 24, 2012, she was at her mother's house with her aunt, Carol Stine-Johnson, her two adult cousins, Sherrita Jeffries and Raymonique Stamp, and her two minor cousins, I.J. (four months old) and S.C. (four years old). Gaines, her aunt, and her cousins decided to walk to a Save-a-Lot store. They were at the store for about 30 minutes. When they left, they walked to the bus stop on Union Avenue, between East 55th and East 65th streets.

**{¶8}** When they got to the bus stop, Gaines testified that she saw a man who was wearing a gray "hoodie" and blue jeans. The man pulled out a gun and pointed it at the women and children. He told them to shut up, get their hands up, and get on their knees. All of the women complied with the man's orders. The man then walked up to each woman individually and told her to give him all of her money. Gaines said that the man

took a Save-a-Lot bag and a diaper bag from Stine-Johnson that had Jeffries's cell phone in it. The man also took money from Jeffries, Stamp, and Gaines.

{¶9} Gaines said that the man did not like the way Stamp was looking at him, so he put the gun to Stamp's head and called her a bitch. He also took Stamp's cell phone.

{¶10} The man approached Gaines and told her to give him all of her money and empty out her purse. The man took two $10 bills from Gaines.

{¶11} The man then walked away from the group, across the street toward East 65th Street. Gaines said that she called the police. Gaines's 911 call was played in court. In the recording, Gaines described the man who just robbed them as wearing a gray "hoodie" and beige pants. Gaines explained that she previously testified that the man was wearing blue jeans because it was "three years ago." Gaines admitted at trial that she could not recall at the time of her present testimony if the man was wearing blue jeans or tan pants. The police were not able to locate the suspect that evening.

{¶12} The following day around 9:00 or 10:00 a.m., Gaines and her brother drove around the area where the robbery had taken place. While they were on East 65th Street not far from the bus stop, Gaines saw a man in a gray "hoodie." She could not recall what color his pants were, but she recalled that the man was "black, tall, husky." She could also recall that the man was bald, and did not have any facial hair. Gaines pointed the man out to her brother as the man who robbed her and her other family members. Her brother called the police.

**{¶13}** On cross-examination, Gaines stated that the bus stop was well lit. But she agreed that at Williams's previous trial, she said that there "wasn't much light" in the area, and that the light was "dim." She also agreed that her memory would have been better at the first trial. But on redirect-examination, she stated that there was enough light for her to see the man's face.

**{¶14}** Gaines also stated on cross-examination that she could not recall if the man's "hoodie" was covering his face during the robbery. But on redirect-examination, Gaines testified that although she could not recall if the man's "hoodie" was pulled over his face, she said that she could see his face clearly during the robbery.

**{¶15}** Gaines could not recall how she identified the robber to police on the night of the incident. She reviewed her statement. She first told police that the male was wearing a gray "hoodie" and beige pants. A couple of days later, she told police that he was wearing a gray "hoodie" and blue jeans.

**{¶16}** Jeffries testified to the events leading up to the incident as Gaines did. Jeffries remembered that the male was wearing a gray "hoodie" that was "over his head." But she did not recall what color pants the male was wearing. She further described the male as "dark skinned" and she "could tell a little bit that he was bald." She said that she could see the male's face during the robbery. Jeffries said that the male approached them, and told them to give him everything they had. Her son, I.F., was in his stroller the entire time. Jeffries testified that everyone gave the male everything they had. She recalled that the male actually went "in her pocket and took some money out" of it. She

also remembered that he took a bag from someone in their group, either her mother (Carol) or her sister (Raymonique). Jeffries said that the male took $10 from her, her cell phone with a picture of her and her son on the cover, as well as a lime green and black diaper bag with diapers, and "a little plastic container for wipes."

{¶17} Jeffries testified that it was dark near the bus stop, but light "enough to see each other's faces." She said it was light enough to see the male's face.

{¶18} Jeffries further stated that at one point, S.C. was crying hysterically. The male said "to shut her up or he was going to shoot her in the head." After the robbery, Jeffries said the male ran down East 65th Street.

{¶19} Officer Joseph Danczak testified that he responded to the scene. He said two of the victims gave a statement, but the other two did not because they were upset. He said that the victims described the robber as a "black male wearing a gray hoodie, tan pants." He said they could not locate the suspect that night.

{¶20} The following day, he received a report that one of the victims saw the suspect in the same area. He patrolled the area. He saw a male wearing the same clothing as described to him by the victims. The male was standing in a driveway in front of a garage. He pulled over to ask the male a couple of questions, and ultimately placed him in his patrol car to detain him while he continued to investigate.

{¶21} The owner of the home gave Officer Danczak permission to search the property. They did not find anything in the house. They then searched the outside of the home. He located the victims' missing items in the trash cans next to where Williams

was standing in the driveway, including the diaper bag, I.F.'s blanket that had been in the bag, a Cleveland Public Library card belonging to Stine-Johnson, Stine-Johnson's mail, diapers, a baby's hat belonging to I.F., reading glasses, and Stine-Johnson's green wallet. Gaines and Jeffries identified these items in court as the items the man had taken from them.

{¶22} Officer Danczak arrested Williams and took him to jail to be "booked and housed."  During the booking process, police collected Williams's property that was on his person and placed it in a bag.  Williams had a cell phone on him.  Police told Williams to turn off his cell phone before they placed it in the bag with his other items. When he did, Officer Danczak saw a picture of the one of the victims and her son "light up" on the screen of the cell phone.  Officer Danczak stated on cross-examination that there were several other individuals standing near Williams when they approached Williams.  Officer Danczak said that police did identify these individuals, patted them down, and ran them for warrants.  He further agreed that Williams did not try to run away from him when he approached him.

{¶23} Gaines identified Williams as the man who robbed her and her family in a photo array on March 30, 2012.  Gaines also identified Williams in court as the man who robbed her.  Gaines said that she had no doubt that Williams was the man who robbed her because she "remembered the features of his face, his eyes, and his nose."  Jeffries identified Williams in a photo array on June 12, 2012, and was also positive that Williams was the man who robbed her.   Jeffries also identified Williams in court.

**{¶24}** The state also had three other witnesses testify as to the photo array process, including two blind administrators who conducted the photo lineup process for each victim, and the detective in charge of the case. At the close of the state's case, Williams moved for a Crim.R. 29 acquittal, which the trial court denied.

**{¶25}** Williams testified on his own behalf. Williams denied that he robbed anyone on March 24, 2012. On the day that he was arrested, he was at a woman's house who he called "mama." He had spent the night at "mama's" house. He hung out with "mama's" sons, T-Bone and Jonathan, and another person, Hank.

**{¶26}** Williams said that he had just purchased the cell phone that police confiscated from his pocket from T-Bone that morning before he was arrested. He bought it to "put music on [his] ears." He said that he was able to listen to music despite the fact that the victim testified her phone was password protected.

**{¶27}** Williams said that T-Bone is bald and "brown like me," but is taller than he is. Williams testified that T-Bone and Jonathan rob people and take the stolen property to "mama's" house. Williams said they have guns too. T-Bone's nickname is "Bad to the bone T-Bone." Williams further testified that Jonathan brought the victims' stolen items into the house, but "mama" made him throw them in the garbage.

**{¶28}** The trial court questioned Williams extensively about what he did on the day of the robbery and the day after the robbery. After the defense rested, Williams renewed his Crim.R. 29 motion, which the trial court denied.

{¶29} The trial court found Williams guilty of the four counts of aggravated robbery with the one- and three-year firearm specifications (Counts 1 through 4 involving the adult victims: Jeffries, Gaines, Stine-Johnson, and Stamps), and guilty of kidnapping with the one- and three-year firearm specifications (Counts 5 through 10 involving the four adult victims and the two minor children who were present: S.C. and I.F.), but not guilty of robbery (Counts 11 through 14 involving the adult victims).

{¶30} The trial court merged all firearm specifications and merged the four kidnapping counts corresponding to the adults with the four aggravated robbery counts. The trial court also merged the two kidnapping counts corresponding to the two minors into the four aggravated robbery counts. The state elected to proceed on the aggravated robbery counts.

{¶31} The trial court sentenced Williams to a total of 14 years in prison: three years in prison for the firearm specifications to be served prior to and consecutive to 11 years for each aggravated robbery count, which the trial court ordered to be served concurrent to each other. It is from this judgment that Williams appeals.

## II. Manifest Weight of the Evidence

{¶32} In his sole assignment of error, Williams acknowledges that the state proved all of the elements of his convictions, but contends that the state's evidence establishing his identity was against the manifest weight of the evidence.

{¶33} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *State v. Thompkins*, 78 Ohio

St.3d 380, 387, 678 N.E.2d 541 (1997). Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id*., citing *State v. Robinson*, 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955).

{¶34} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only in the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id*.

{¶35} After reviewing the evidence in this case, we cannot say that the trier of fact clearly lost its way regarding Williams's identity and created such a manifest miscarriage of justice that Williams's convictions must be reversed and a new trial ordered.

{¶36} Williams first argues that evidence of his identity was suspect because it was based on the fact that "the fruits of the thefts" were found in a garbage can near where he was standing, but where several other people were also standing. Although there were several people standing with Williams when police arrived, Officer Danczak noticed

Williams because he was wearing the same clothes that the victims told him the robber was wearing the previous night — tan pants and a gray "hoodie."

{¶37} Williams also challenges the weight of the evidence regarding his identity because his convictions were based on eyewitness identification. He asserts that the lighting was "dim," and that the witnesses' testimony conflicted as to what color his pants were on the night of the robbery.

{¶38} Even if the lighting was "dim," the victims testified at trial that they could still clearly see Williams's face during the robbery. Gaines even stated that she could remember the man's facial features, his eyes, and his nose. And the victims' testimony at trial may have conflicted regarding whether Williams was wearing tan or blue pants, but their testimony as to the fact that he was wearing a gray "hoodie" never altered. Further, Gaines told the 911 dispatcher on the night of the incident that the robber was wearing beige pants — exactly what he was wearing when police found him the next day, just down the street from the bus stop where the robbery took place — and standing in close proximity to the garbage that contained the victims' stolen items.

{¶39} Williams further contends that the state's evidence regarding his identity was suspect because the detective who conducted the photo array with respect to Gaines did not follow the procedures set forth in R.C. 2933.83 (procedures for conducting a "photo lineup" using "an array of photographs"). Williams, however, does not assert any specific argument as to how the detective failed to follow the procedures, or point to any specific deficiency in how the detective conducted the process. He does state in his

"statement of facts" that Detective Rhonda Gray "did not use the 10-folder method required by the statute."

**{¶40}** The "10-folder method," however, is not required by R.C. 2933.83. What is required is that the law enforcement agency must "adopt specific procedures for conducting the lineups," and the "procedures, at a minimum, shall" use a blind administrator. Detective Rhonda Gray was the blind administrator for Gaines's identification in this case. Detective Rhonda Gray stated that she did not know who the suspect was, nor did she know anything about the case when she showed Gaines the photo array. Thus, police complied with the procedures set forth in R.C. 2933.83 regarding Gaines's identification of Williams in the photo array.

**{¶41}** Even if we assume for the sake of argument that the photo lineup procedures were not in full compliance with the statute regarding Gaines's identification of Williams, we find that it would not be prejudicial to Williams because the evidence against him was overwhelming.

**{¶42}** Jeffries also identified Williams in a photo array. The blind administrator for Jeffries's identification was Detective Eugina Gray. Notably, Williams does not challenge Detective Eugina Gray's photo lineup process (she used the "10-folder method") or Jeffries's identification of him.

**{¶43}** Moreover, when police took Williams to the police station for booking, Williams had Jeffries's cell phone in his pocket. Williams testified that he had just purchased the cell phone from T-Bone on the morning before he was arrested. Williams

said that he only purchased the cell phone to listen to music because he had another cell phone that he used to call people. But Jeffries testified that her phone was password protected, and thus, Williams would not have been able to access the data on Jeffries's phone — even to listen to music.

{¶44} Williams testified at trial that it was T-Bone and Jonathan who robbed the victims. The trial court, as the factfinder, extensively questioned Williams as to what he was doing on the day of the robbery, and the day after the robbery. The trial court found Williams's testimony to be self-serving and not credible. Although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the factfinder's determination of the witnesses' credibility. *In re S.H.*, 8th Dist. Cuyahoga No. 100529, 2014-Ohio-2770, ¶ 27, citing *State v. Chandler*, 10th Dist. Franklin No. 05AP-415, 2006-Ohio-2070, ¶ 9. Further, the trier of fact is free to believe or disbelieve all or any of a witness's testimony. *State v. Montgomery*, 8th Dist. Cuyahoga No. 95700, 2011-Ohio-3259, ¶ 10. Thus, the factfinder in this case was free to disbelieve Williams's testimony. Indeed, the trial court found that the evidence against Williams's identity was overwhelming, and we agree.

{¶45} Accordingly, after reviewing the entire record, weighing all of the evidence and all reasonable inferences, and considering the credibility of the witnesses, we find that this is not the "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

**{¶46}** Williams's sole assignment of error is overruled.

## III.  Allied Offenses

**{¶47}** In the state's cross-appeal, it argues that the trial court erred when it merged the two kidnapping counts corresponding to the two minor children with the aggravated robbery counts.   We agree.

**{¶48}** An appellate court applies a de novo standard of review when reviewing whether two offenses are allied offenses of similar import.  *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

**{¶49}** R.C. 2941.25 provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶50}** In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Ohio Supreme Court defined the meaning of "similar import."   It explained that even if two offenses are committed with "identical conduct and the same evidence," that "R.C. 2941.25(B) states that the same conduct can be separately punished if that conduct constitutes offenses of dissimilar import."   (Emphasis sic.)  *Id*. at ¶ 20.   In interpreting R.C. 2941.25(B), the court stated that there are in fact "three categories in which there can be multiple punishments: (1) offenses that are dissimilar in import, (2) offenses

similar in import but committed separately, and (3) offenses similar in import but committed with separate animus." *Id.* Thus, under R.C. 2941.25(B), "the inquiry should not be limited to whether there is separate animus or whether there is separate conduct. Courts must also consider whether the offenses have similar import." *Id.* at ¶ 22, citing *State v. Baer*, 67 Ohio St.2d 220, 226, 423 N.E.2d 432 (1981).

{¶51} In further defining what "import" means, the Supreme Court concluded that "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus.

{¶52} In this case, the trial court properly merged the kidnapping counts with the aggravated robbery counts with respect to the four adults. Thus, the trial court properly merged Counts 5 through 8 (adult kidnapping charges) with Counts 1 through 4 (aggravated robbery charges). But there were no aggravated robbery charges with respect to the children because Williams did not take anything from the children. The trial court, however, still merged counts 9 and 10 (the kidnapping charges involving the two children) with the four aggravated robbery counts. In doing so, the trial court noted that it was required to consider "animus and whether there was one course of conduct."

{¶53} It is well established, however, that when there are multiple victims, a defendant can be convicted of multiple offenses. This is because when there are separate victims, the offenses are of dissimilar import. *Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995,

34 N.E.3d 892, at paragraph two of the syllabus. Here, Williams was convicted of two counts of kidnapping with respect to the two minor children who were present. Williams acted with a separate animus involving these two victims. *Id.*

{¶54} Accordingly, we sustain the state's single assignment of error.

{¶55} Judgment affirmed in part and reversed in part. Williams's convictions are affirmed, but his sentence is vacated, and the matter is remanded for resentencing.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for resentencing.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_
MARY J. BOYLE, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
PATRICIA ANN BLACKMON, J., CONCUR